Stephen A. SACCOCCIA

v.

UNITED STATES of America.

C.A. No. 97–248T.

United States District Court,
D. Rhode Island.

Sept. 15, 1999.

Michael J. Lepizzera, Law Offices of William C. Dimitri, Providence, RI, Mark E. Overland, Overland & Gits, Santa Monica, CA, James Moretti, Cranston, RI, for Stephen A. Saccoccia, petitioner.

James H. Leavey, United States Attorney's Office, Providence, RI, Michael P. Iannotti, U.S. Attorney Office, Providence, RI, for United States of America, respondent.

## MEMORANDUM AND ORDER

TORRES, District Judge.

Stephen Saccoccia has moved to vacate his sentence, pursuant to 28 U.S.C. § 2255. For reasons hereinafter stated, that motion is denied.

### Background

In 1993, Stephen Saccoccia was convicted of multiple counts of RICO conspiracy, money laundering and related offenses arising out of his activities in laundering the proceeds of illegal drug transactions. He was sentenced to 660 years in prison and was ordered to forfeit the $136 million in proceeds that he laundered. *See United States v. Saccoccia*, 823 F.Supp. 994 (D.R.I.1993). The conviction and sentence were affirmed on appeal. *See United States v. Saccoccia*, 58 F.3d 754 (1st Cir. 1995).

Saccoccia now moves to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. He makes a plethora of arguments, many of which are difficult to decipher because they are fragmented, inadequately developed and, in some cases, alluded to only in footnotes. The Court will address those issues that are the subject of comprehensible arguments accompanied by relevant factual allegations. All other issues are deemed waived. *See*

*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (on appeal, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.... Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotes and citations omitted).

### Standard of Review

Saccoccia challenges his conviction on a variety of grounds, including ineffective assistance of counsel, double jeopardy, due process violations arising from the presentation of perjured testimony, errors in the Court's charge to the jury, and errors in sentencing.

In assessing Saccoccia's claims, the Court must accept the factual averments found in his petition as true, but it "need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir.1993). The petition may be denied without an evidentiary hearing "when (1) the motion is inadequate on its face, or (2) the movant's allegations even if true, do not entitle him to relief, or (3) the movant's allegations need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." *David v. United States*, 134 F.3d 470, 477 (1st Cir.1998) (citation omitted). No hearing is required if the petition is based on mere speculation, leaps of logic, or unreasonable inferences. *See Aleman v. United States*, 878 F.2d 1009, 1012, 1013 & n. 9 (7th Cir.1989).

The Court is not required to consider issues that the petitioner is procedurally barred from raising. Thus, claims

raising issues that previously were decided on direct appeal may not be asserted again in a § 2255 motion. *See United States v. Michaud,* 901 F.2d 5, 6 (1st Cir.1990). The petitioner, also, is barred from asserting claims that could have been asserted on appeal unless the failure to assert them is justified by a showing of cause and prejudice. *See Reed v. Farley,* 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994); *Knight v. United States,* 37 F.3d 769, 774 (1st Cir.1994).

In this case, none of Saccoccia's claims, except the alleged violation of attorney-client privilege, requires an evidentiary hearing.

### *Discussion*

I. *Interference with Right to Effective Assistance of Counsel*

■ Shortly after Saccoccia's arraignment, Jack Hill, Saccoccia's trial counsel, traveled to Austria and attempted to withdraw certain funds from one of Saccoccia's bank accounts. Austrian authorities, believing that the accounts contained the proceeds of illegal drug transactions, arrested Hill who was incarcerated in an Austrian prison from mid-August until early November of 1992.

Saccoccia asserts that Hill's arrest and incarceration were engineered by the United States government for the purpose of hindering his defense and that those actions deprived him of his Sixth Amendment right to effective assistance of counsel. More specifically, Saccoccia alleges that, when Hill expressed concern that his fee for representing Saccoccia would be subject to forfeiture if Saccoccia was convicted, James Leavey, the lead prosecutor, assured Hill that any fees derived from sources not previously known to the government would not be forfeited, thereby encouraging Hill to seek out Saccoccia's hidden assets. However, according to Saccoccia, the government later orchestrated Hill's arrest by Austrian authorities.

Saccoccia's allegations are sheer speculation. He presents no evidence to back up his claim or to explain why he waited for five years to make them. Saccoccia cites the following statement by Leavey to the Court as proof that the government induced Hill to travel to Austria for the purpose of retrieving some of Saccoccia's assets:

> Mr. Semenza spoke about a race for the proceeds. While I do not object and do not disagree with the statements he made, the conversations that he had with me this afternoon, I don't think my telling a defense attorney who calls me and says I know where an account is, can we take it without your forfeiting it, and my response, you tell me where it is, we're going to seize it, necessarily means that that's a race for the proceeds.

(Sept. 28, 1992 Tr. at 126.) However, a careful reading of that statement, in the context in which it was made, reveals that the statements with which Leavey did "not disagree" were to the effect that, if Semenza revealed the location of any of Saccoccia's assets, the government would seize them. Leavey's statement clearly does not support the claim that the government was inviting a "race for the proceeds" in which the winner would get to keep the money.

Even if Hill went to Austria in the expectation that he would be able to keep any of Saccoccia's assets that he obtained, there is no evidence that the government caused Hill to be arrested. Saccoccia baldly asserts that some unidentified government agent provided an anonymous tip to the Austrian authorities that led to Hill's arrest; but, once again, he fails to furnish any factual basis for that assertion.

Moreover, Saccoccia fails to explain how Hill's detention rendered him ineffective. Hill was released in mid-November of 1992, after having been detained for approximately three months. At that time Saccoccia's trial was underway, but in early November a mistrial was declared due to the incapacity of Brian Adae, Saccoccia's other counsel. Because of Hill's ordeal, Saccoccia's trial was rescheduled for March of 1993. That four month delay

offered Hill one month more in which to prepare than he lost during his three month detention in Austria. Thus, it is difficult to see how the fact that he was detained rendered his assistance ineffective.

Finally, Saccoccia, who was arrested in Switzerland, avers that Swiss police, at the behest of George Shank, the FBI legate, prevented Saccoccia's attorneys from meeting with him before he was extradited. Saccoccia bases that allegation on a letter from Lawrence Semenza, Donna Saccoccia's trial counsel, to former Attorney General William Barr in which Semenza states that Swiss police informed him that Shank refused to authorize any visits. (*See* Saccoccia Ex. 41 in Supp. of § 2255 Mot.) However, even if the allegation is true, it falls far short of a Sixth Amendment violation that would warrant vacating Saccoccia's conviction. Since the alleged interference occurred at a non-critical stage of the prosecution, Saccoccia is not entitled to relief absent a showing that he was prejudiced by the government's conduct. *See United States v. Morrison,* 449 U.S. 361, 364–65, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). Here, no such showing has been made. Saccoccia has failed to explain how his inability to communicate with counsel during the brief period just before his extradition prejudiced him in any way.

## II. *Double Jeopardy*

The trial of Saccoccia and his co-defendants began in November of 1992. Because Hill was still incarcerated in Austria and there was no way to determine if or when he would be freed, Saccoccia's defense was conducted by his co-counsel Brian Adae. In the middle of trial, Adae stated that he was incapable of continuing because of personal problems and was permitted to withdraw. By that time, Hill

had been released but he was not prepared to step into the breach upon such short notice. Accordingly, Saccoccia moved for a mistrial with respect to the case against him. That motion was granted and, as already noted, Saccoccia was tried several months later. Saccoccia now argues that the retrial violated the prohibition against double jeopardy.[1]

■ The general rule is that, when a mistrial is declared, the Double Jeopardy Clause does not bar a retrial if the mistrial was requested by the defendant. However, a retrial is barred where the government engages in conduct that "is intended to 'goad' the defendant into moving for a mistrial." *Oregon v. Kennedy,* 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

■ Saccoccia's assertion that the government "goaded" him into moving for a mistrial is patently frivolous. The request for a mistrial was precipitated by Adae's incapacity and not by any governmental misconduct. Moreover, it led to a postponement of the trial, an objective that Saccoccia had vigorously pursued to the point of seeking a writ of *mandamus* to prevent the trial from beginning. In addition, Saccoccia's argument that the government's wrongful conduct in causing Hill to be detained in Austria forced him to seek a mistrial misses the mark because, as already noted, there is no factual basis for the premise on which it rests.[2]

## III. *Conflicts of Interest*

Saccoccia claims that he, also, was deprived of his Sixth Amendment rights because the performance of both Hill and Kenneth O'Donnell, Hill's co-counsel during the second trial were impaired by conflicts of interest.

---

**1.** This issue was not presented to the Court before the second trial. However, Saccoccia asserts that his counsel was deficient in failing to raise it earlier.

**2.** Saccoccia also contends that his request for a mistrial (and, therefore, his waiver of his

rights under the Double Jeopardy Clause) was invalid because he was counseled by an attorney who had a conflict of interest, namely Jack Hill. Hill's purported conflict of interest will be dealt with in the next section.

### 1. *Hill's Conflict*

■ It is true that the charges brought against Hill in Austria created a potential conflict of interest in connection with his representation of Saccoccia. However, prior to trial, that conflict was fully explained to Saccoccia, and after a lengthy colloquy with the Court, Saccoccia chose to have Hill continue representing him and he expressly waived his right to conflict free representation by Hill. (*See* Dec. 10, 1992 Tr.) Nevertheless, Saccoccia, now, presents a melange of reasons why he is entitled to collateral relief. Although the arguments are somewhat muddled, they appear to strike three themes.

#### i. *Voluntariness of Waiver*

First, Saccoccia argues that he was coerced into waiving Hill's conflict because this Court set an early trial date that left him with no choice but to accept Hill as his counsel. That argument is meritless and has been rejected by the First Circuit. *See Saccoccia,* 58 F.3d at 771–72 ("[A]ppellant's claim that he was faced with an intolerable dilemma—he could accept Hill as his counsel or proceed to trial with an attorney who was untutored in the case—is flatly contradicted by the record. Appellant insisted, time and again, despite the district court's painstaking explanation of his right to conflict-free counsel, that Hill was the advocate of his choosing."). Since issues decided on direct appeal may not be raised again via a § 2255 motion, *see United States v. Michaud,* 901 F.2d 5, 6 (1st Cir.1990); and, since Saccoccia has failed to present any new facts that would justify revisiting the matter, his coercion claim is summarily rejected.

#### ii. *Knowledge of Conflict*

Next, Saccoccia asserts that his waiver was not knowing and intelligent because, in essence, he did not know all of the details regarding the investigation of Hill. More specifically, Saccoccia alleges that, unbeknownst to him, Hill still was under investigation and the threat of prosecution by both Austrian and American authorities at the time of trial and that the govern-ment lied when it denied its continuing role in that investigation. However, Saccoccia has failed to present any facts to support that speculation. Indeed, to this day, the government has brought no charges against Hill.

Even if it is assumed, *arguendo,* that the government was participating in a continuing investigation of Hill, Saccoccia fails to explain how that would give rise to any conflict that was not fully explained to him at the time of his waiver. (*See* Dec. 10, 1992, Tr. at 17–20.)

#### iii. *Validity of Waiver*

■ Finally, Saccoccia argues that the nature of Hill's conflict was such that it could not be waived. It is true that, in some circumstances, counsels' conflict of interest may provide a basis for an ineffective assistance claim even though the defendant waived his right to conflict-free counsel. "However, '[when] a defendant has voluntarily chosen to proceed with [a potential conflict]'" he must "'demonstrate that a conflict of interest actually affected the adequacy of representation.'" *United States v. Fahey,* 769 F.2d 829, 835 (1st Cir.1985) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 353, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (Brennan, J., concurring)); *accord Doherty v. United States,* 948 F.Supp. 111, 117 (D.Mass.1996). More specifically, the defendant must establish "that some plausible alternative defense strategy or tactic might have been pursued," and "that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Fahey,* 769 F.2d at 836. The defendant need not prove that the alternative defense or tactic would have resulted in an acquittal but he must demonstrate that the prospect of success was sufficient to warrant pursuing it.

In this case, Saccoccia has failed to make any such showing. He recites a litany of alleged omissions by Hill, including his failure to challenge the admissibility of testimony by Burcahard Mühl, a

prosecution witness who also participated in the investigation of Hill; his failure to raise the government's alleged interference with Saccoccia's right to consult counsel prior to his extradition and his failure to argue that the government had violated Saccoccia's Sixth Amendment rights by allegedly causing Hill to be detained in Austria. However, Saccoccia has failed to present anything indicating that any of those actions had a realistic prospect of succeeding. On the contrary, all of the alleged omissions are either patently specious, or, as already noted, rest on unsupported premises. Accordingly, they are not plausible defenses or tactics that Hill can be faulted for not pursuing.

In addition, Saccoccia has failed to establish any link between Hill's alleged conflict and his failure to pursue these tactics. He provides no explanation as to why any investigation of Hill would have prevented him from taking the actions advocated by Saccoccia. In short, Saccoccia has failed to demonstrate that, because of Hill's alleged conflict of interest, he did or failed to do anything that deprived Saccoccia of effective representation.

Saccoccia's fall-back position is that, even if he has failed to demonstrate prejudice resulting from Hill's conflict, Hill's continued representation constituted a *per se* violation of the Sixth Amendment. In this connection, Saccoccia relies upon several cases holding that, when trial counsel is implicated in the same crime for which his client is on trial, the attorney's continued representation of the client is *per se* ineffective assistance. *See, e.g., United States v. Soldevila–Lopez,* 17 F.3d 480, 487 n. 4 (1st Cir.1994), and cases cited therein.

However, that reliance is misplaced. Hill never was charged with the same crime as Saccoccia. In fact, there is no indication that, since the time of trial, Hill has been charged with *any* crime by either Austrian or American authorities.

More importantly, Saccoccia's *per se* violation argument was raised on appeal and rejected by the Court of Appeals. It observed that cases finding a *per se* violation

of the Sixth Amendment "tend to involve circumstances in which an attorney has reason to fear that a vigorous defense of the client might unearth proof of the attorney's criminality," but that those concerns were not present here. *Saccoccia,* 58 F.3d at 772.

### 2. *O'Donnell's Conflict*

Saccoccia's claim that O'Donnell, too, had a conflict of interest that deprived Saccoccia of effective assistance of counsel, also is barred because it was decided on appeal. The alleged conflict was O'Donnell's representation of an individual who, previously, was acquitted of related charges. According to Saccoccia, that individual was not called as a witness for Saccoccia because of O'Donnell's concern that it would expose the falsity of testimony he gave at his own trial. However, the Court of Appeals rejected that claim, saying:

> Appellant's convoluted explanation of how O'Donnell's concluded representation of Marotto created a conflict of interest is difficult to follow. He seems to be saying, without any citation to the record, that Marotto (who was not called to testify at appellant's trial) could have been a material witness. We reject this unfounded speculation.

*Saccoccia,* 58 F.3d at 772.

### IV. *Brady Violations*

Saccoccia's next claim is that the government failed to correct perjured testimony and withheld exculpatory evidence. Both would be violations of the prosecutor's obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and, moreover, if there is a reasonable likelihood that the tainted testimony or the withheld evidence could have affected the verdict, they would warrant vacating Saccoccia's conviction. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### 1. *The Allegedly Perjured Testimony*

Saccoccia asserts that the testimony of Barry Slomovits and Ahron Sharir was false and that the government knew it. Slomovits testified that, after 1988, he was involved in money laundering activities only with Saccoccia. Sharir testified that he engaged in money laundering activities with Slomovits until 1988 and that, between 1988 and 1990, he laundered money solely with Saccoccia.

According to Saccoccia, after 1988, Slomovits and Sharir engaged in money laundering with one another and with other persons. However, even if those allegations are true, Saccoccia is not entitled to have his conviction vacated because he has failed to present any evidence suggesting that prosecutors were aware of the alleged perjury, or any explanation as to how the testimony in question, could have influenced the verdict.[3]

 Absent evidence that, at the time of trial, the government knew that false testimony was given, a petition for relief under § 2255 is governed by the standard applicable to a motion for a new trial based on newly discovered evidence. *See Cruz–Sanchez v. Rivera–Cordero*, 835 F.2d 947, 948 (1st Cir.1987) (stating that in a § 2255 motion, "[t]he proper characterization of [a claim of] perjury is that of evidence newly discovered after trial"); *Pelegrina v. United States*, 601 F.2d 18, 19 (1st Cir.1979) (treating a § 2255 claim of newly discovered evidence as a motion for a new trial). Thus, the petitioner must show that truthful testimony would be "likely to result in an acquittal upon retrial." *United States v. Tibolt*, 72 F.3d 965, 971 (1st Cir.1995). Here, Saccoccia has failed to explain how the outcome of his trial would have been altered by evidence that Sharir and Slomovits, also, were laundering money with persons other than Saccoccia.

### 2. *The Allegedly Exculpatory Evidence*

Saccoccia avers that some of the assets seized by the government pursuant to the $136 million forfeiture judgment were returned to parties claiming that the assets rightfully belonged to them. According to Saccoccia, this proves that, at least, that portion of the seized assets was legitimately derived and was not the proceeds of money laundering activities. However, Saccoccia offers no clear explanation as to how the fact that some of the seized assets really may have belonged to others would exculpate him. Nor does he present any facts that would support or shed light on his theory.

 In addition, Saccoccia's argument rests on a false premise. The mere fact that others may have had legitimate claims to some of the assets seized says nothing about whether Saccoccia is guilty of the money laundering activities for which he was convicted. There is no indication that Saccoccia's conviction was based on any allegation that the returned assets were the proceeds of Saccoccia's money laundering activities. On the contrary, it appears that those assets were seized pursuant to the "substitute" assets forfeiture order that was entered because the proceeds directly traceable to Saccoccia's money laundering activities had been concealed, dissipated or placed beyond the Court's jurisdiction. *See* 18 U.S.C. § 1963(m). Therefore, the fact that third parties may have established legitimate claims to some of the seized assets has no bearing on whether Saccoccia engaged in money laundering or how much he may have laundered. Even if the assets in question were the proceeds of Saccoccia's money laundering activity, the fact that they were returned to third parties would not establish that Saccoccia was wrongfully convicted. Forfeitable assets may become the property of innocent third parties who acquired them for value and without knowledge that

---

**3.** The government concedes that Slomovits falsely denied laundering money with persons other than Saccoccia after 1988, but it denies that it knew this at the time of trial.

they were derived from illegal activity. *See* 18 U.S.C. § 1963(1).

Saccoccia also complains about the government's failure to turn over an agent's handwritten notes of a pretrial interview in which Slomovits allegedly stated that he agreed that he would launder cash for Saccoccia instead of for Duvan Arboleda. According to Saccoccia, the notes demonstrate that the agreement was made sometime in 1989 rather than in 1987 as Slomovits testified at trial. However, while the notes contain a reference to the year 1989, they do not establish that as the date of the agreement referred to by Slomovits. (*See* Saccoccia Ex. 51 in Supp. of § 2255 Mot.)

More importantly, Saccoccia fails to explain how the alleged discrepancy could have affected the verdict. The lack of such an explanation is especially significant in light of the otherwise overwhelming evidence against Saccoccia and the fact that all of the offenses charged in the indictment occurred after 1989.

### 3. *Impeachment Evidence Regarding Sharir*

Finally, Saccoccia contends that the government did not disclose that its plea agreement with Sharir included what Saccoccia asserts was a promise of favorable treatment for Sharir's wife, who pled guilty to conspiracy to launder money.

Presumably, Saccoccia is suggesting that such information would have been useful in attempting to impeach Sharir. However, once again, Saccoccia has presented no facts to support the premise upon which his argument rests. He relies on the fact that Mrs. Sharir received a sentence of only five years probation but he offers no evidence that the disposition was part of any agreement with Ahron Sharir. The failure to present any such evidence is especially telling because Saccoccia had the opportunity to cross examine Sharir, at length, after the government voluntarily disclosed the existence of a plea agreement.

Even if the huge inferential leap advocated by Saccoccia could be justified, it is unreasonable to conclude that the verdict would have been affected by revealing the alleged promises. The jury was informed that, pursuant to his plea agreement, Sharir had agreed to co-operate with the government in exchange for promises of leniency.[4] The jury also was told that Sharir, previously, had been convicted of bank fraud. It is difficult to see how the additional disclosure of an alleged promise of unspecified leniency for Sharir's wife could have affected the jury's assessment of his credibility.

### V. *The § 1957 Charge*

Saccoccia argues that his Fifth Amendment right to due process was violated by what he asserts was an erroneous charge to the jury regarding the elements of an offense under 18 U.S.C. § 1957. Like most of Saccoccia's other arguments, this argument is rather muddled. The gist of the argument appears to be that by not instructing that the government was required to prove that all of the money *in Saccoccia's bank accounts* came from illegal drug transactions, the Court permitted the jury to find him guilty of laundering money obtained from legitimate sources. That argument ignores that portion of the instruction in which the jury was told that, under § 1957, the government was required to prove that the money allegedly *laundered* was derived from illegal drug transactions. (*See* March 11, 1993 Tr. at 12.) (stating that one element of a § 1957 offense is "that the criminally derived property was, in fact, derived from a specified unlawful activity, in this case narcotics trafficking").

In any event, Saccoccia is procedurally barred from raising this issue because it was not raised on appeal. The general rule is that issues not raised on appeal are waived absent a showing of cause and prejudice. *See Reed v. Farley*, 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277

4. The agreement, itself, was admitted into evidence.

(1994); *Knight v. United States,* 37 F.3d 769, 774 (1st Cir.1994). An exception is made in cases where the issue cannot be raised on appeal. The prime example is a claim of ineffective assistance on the part of trial counsel. Since appellate counsel, ordinarily, cannot raise an issue that trial counsel failed to preserve; and, since, claims of ineffective assistance generally are not entertained in a direct appeal, such claims are properly the subject of § 2255 motions. *See id.* at 774. However, here, since Saccoccia's appellate counsel could have raised the issue, Saccoccia is barred from raising it now.

## VI. *The Evidence Regarding the § 1956(a)(2) Charge*

Saccoccia argues that he was deprived of his due process rights because the evidence was insufficient to establish one of the elements of money laundering under 18 U.S.C. § 1956(a)(2); namely, the requirement that the laundered funds be transferred from a place inside the United States to a place outside the United States. Since that issue, also, could have been raised on appeal, Saccoccia is procedurally barred from raising it now. *See Reed,* 512 U.S. at 354; *Knight,* 37 F.3d at 774.

Saccoccia further argues that his counsel was ineffective in not presenting evidence negating that element. However, he fails to identify what evidence he is referring to other than by making vague assertions. For example, Saccoccia asserts that with respect to count 131, his attorney should have shown that "[t]he wire transfer authorized by Movant was not an international wire transfer, but rather a transfer to Swiss Bank Corporation, in New York, with further credit to Banco Popular," (Mem. of Law in Supp. of Mot. Pursuant to 28 U.S.C. § 2255 at 60), but he fails to allege any specific facts that would support that assertion.

## VII. *Sentencing Errors*

Saccoccia makes a potpourri of creative arguments alleging a variety of errors in his sentence that he claims went unredressed because of the ineffectiveness of his trial counsel. None of those arguments merits anything more than summary rejection.

■ Saccoccia contends that his trial counsel was deficient in not seeking a downward departure on the ground that the amount laundered was artificially inflated by the government's failure to prosecute as soon as it had evidence of his money laundering activities, conduct that Saccoccia describes as "sentencing factor manipulation." That argument is specious on its face. The government is not required to prosecute as soon as it has evidence that a defendant committed a crime. Such a requirement would deprive law enforcement authorities of the opportunity to gather evidence against other, and perhaps more culpable, participants in the criminal activity. *See United States v. Lovasco,* 431 U.S. 783, 790–96, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (even if the government has proof beyond a reasonable doubt of an accused's guilt, it is not required to prosecute immediately). Moreover, failure to immediately prosecute falls far short of what fairly can be described as sentencing factor manipulation. *See generally United States v. Carreiro,* 14 F.Supp.2d 196, 200–01 (D.R.I.1998) (discussing the doctrine of sentencing factor manipulation).

Saccoccia also claims that his counsel should have sought a downward departure on the ground that, by blocking his attempt to wire $5 million to Colombian drug lords, the government caused him to be subjected to death threats that coerced him into continuing his money laundering activities. That assertion, like the previous one, is inconsistent both with the claims of innocence that underlie Saccoccia's other arguments and with the evidence that overwhelmingly demonstrates that Saccoccia was a willing participant in the money laundering scheme from its inception until his arrest.

Saccoccia's next argument that his offense level was erroneously calculated was rejected by the Court of Appeals. *See Saccoccia,* 58 F.3d at 764 n. 4. Accordingly,

he is procedurally barred from raising the issue now.

Finally, Saccoccia argues that this Court erred in increasing his offense level by three levels for obstructing justice by lying about a back injury in order to postpone the trial. That issue was raised on appeal but the Court of Appeals declined to address it because it was moot in light of the sentence imposed. The issue is still moot; but, in any event, the Court reaffirms its ruling for reasons set forth in the record.

## VIII. *The Purported Interception of Attorney–Client Communications*

The only claim made by Saccoccia that requires an evidentiary hearing is the claim that his Fifth Amendment due process rights and his Sixth Amendment right to effective assistance of counsel were violated because, at the time of Hill's arrest in Austria, documents containing confidential communications between Hill and Saccoccia were seized by Austrian authorities and turned over to Justice Department officials. The gist of the due process claim appears to be that Saccoccia's conviction resulted from evidence that was obtained in violation of his Sixth Amendment rights.

In considering this claim, the threshold question is whether Saccoccia is procedurally barred from asserting it because he failed to assert it on appeal. Saccoccia apparently attempts to circumvent the procedural bar by denying any prior knowledge of the underlying facts and by asserting that Hill's failure to raise the issue amounted to ineffective assistance, and by asserting that the government's alleged violation of the attorney-client privilege rendered Hill's assistance ineffective.

Saccoccia claims that Hill did not challenge the government's conduct because of a conflict of interest. That claim is easily resolved. Although Saccoccia does not specify the source of the alleged conflict, he, presumably, is referring to Hill's diffi-

culties with Austrian authorities. In any event, Saccoccia offers no explanation as to why Hill's alleged conflict would have prevented him from raising the breach of attorney-client relationship issue.

Whether Hill was otherwise ineffective for not challenging the seizure turns on whether there was a reasonable basis for mounting such a challenge and on whether Saccoccia was prejudiced, in any way, by the failure to mount one. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, the Court will turn its attention to the merits of the claim regarding breach of the attorney-client privilege.[5]

### 1. *The Legal Principles*

■ Governmental interception of privileged communications between a criminal defendant and his attorney may amount to a denial of effective assistance of counsel that violates the Sixth Amendment. *See United States v. Kelly,* 790 F.2d 130, 134 n. 1 (D.C.Cir.1986) (citing *Weatherford v. Bursey,* 429 U.S. 545, 554 n. 4, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)). However, not every interception rises to the level of a Constitutional violation. Two important factors to be considered are whether the information obtained was transmitted to prosecutors and whether any of the government's trial evidence was derived from anything learned through the intrusion. *See Weatherford,* 429 U.S. at 554, 97 S.Ct. 837; *see also United States v. Neill,* 952 F.Supp. 834, 840 (D.D.C.1997) (enumerating factors to be considered). Thus, generally, in order to establish a Sixth Amendment violation, a defendant must demonstrate prejudice by making "a showing that there is a 'realistic possibility of injury' to [the] defendant[ ] or 'benefit to the State' as a result of the government's intrusion into the attorney-client relationship." *United States v. Mastroianni,* 749 F.2d 900, 907 (1st Cir.1984) (quoting

---

5. Because the Court ultimately finds there to be no prejudicial breach of the attorney-client privilege, it is not necessary to resolve wheth-

er Saccoccia had prior knowledge of the facts underlying this claim.

*Weatherford v. Bursey,* 429 U.S. at 558, 97 S.Ct. 837).

■ A *prima facie* showing of prejudice may be made by presenting evidence that privileged communications were obtained by the government. *See id.* at 907–08. At that point, "the burden shifts to the government to show that there has been ... no prejudice to the defendant[ ] as a result of [the] communications." *Id.* at 908.

### 2. *The Facts*

In this case, the government acknowledges that a number of documents seized from Hill were turned over to Justice Department officials in Washington. However, the government contends that it established a "Chinese wall" consisting of Justice Department lawyers who were charged with screening the documents and assuring that no privileged communications were transmitted to prosecutors in Rhode Island. Saccoccia asserts that eight of the seized documents were privileged and that they were forwarded to Rhode Island prosecutors.

On June 24, 1999, the Court conducted an evidentiary hearing for the purpose of determining whether any of the eight documents, in fact, were forwarded to the Rhode Island prosecution team; if so, whether they contained privileged attorney-client communications; and, if so, whether Saccoccia was prejudiced by their disclosure. After carefully considering the evidence presented, the Court finds the pertinent facts to be as follows.

Angela Schmidt, a Justice Department attorney, was in charge of screening the documents seized from Hill. After reviewing them, she made a list of those documents that she preliminarily concluded were not privileged. Schmidt sent the list to Brian Adae, Saccoccia's co-counsel, and she told Adae that she intended to forward them to Rhode Island prosecutors unless Adae objected. That list included the eight documents that are the subject of Saccoccia's challenge, namely, Exhibits 24–31 that are attached to his § 2255 motion.[6]

Although Adae never responded, Schmidt has no recollection as to whether she sent all of the listed documents to Rhode Island prosecutors. However, James Leavey, the lead prosecutor, clearly recalled that only two of the eight challenged documents, Exhibits 24 and 26, were forwarded and that he first saw the remaining six documents when Saccoccia's § 2255 motion was filed. The Court finds Leavey to be a very credible witness. In addition, while the recollection of Michael Davitt, Leavey's co-counsel, was less clear, his testimony corroborated Leavey's. Accordingly, the Court finds that Exhibits 24 and 26 were the only challenged documents forwarded to Rhode Island prosecutors.

■ The only remaining question is whether Exhibits 24 and 26 were privileged attorney/client communications the disclosure of which prejudiced Saccoccia. As to both documents, the answer to that question is no.

Exhibit 24, on its face, is not privileged. It consists of two powers of attorney, both bearing the signature "Stephen Anthony," one of Saccoccia's aliases. The first one designates Dr. Harald Schmidt as attorney-in-fact and the second is left blank. Saccoccia has presented no evidence that the documents represent communications between him and his attorney. There is no indication regarding what role, if any, Hill played in their preparation. Nor is there any indication that Harald Schmidt was Saccoccia's attorney.

More importantly, a power of attorney is not a confidential communication. On the contrary, it is prepared for the purpose of being presented to third parties as evidence that the holder of the power is authorized to act on behalf of the person signing it.

---

6. In order to avoid confusion, the exhibits presented at the evidentiary hearing were given the same designations as the exhibits attached to Saccoccia's motion.

Even if Ex. 24 is, somehow, privileged, it is difficult to see how Saccoccia could have been prejudiced by its disclosure. It is devoid of any content and neither it nor any evidence relating to it was presented at trial.

The same may be said with respect to Ex. 26 which consists of handwritten notes. Saccoccia stated that the notes were made by him and Hill when Saccoccia attempted to explain to Hill that money alleged by the government to be proceeds of illegal transactions was, in fact, money that Saccoccia had earned through legitimate business activities.

Assuming, *arguendo,* that the notes are privileged, the government has sustained its burden of showing that Saccoccia was not prejudiced by their disclosure. On its face, Ex. 26 is incomprehensible. It consists of a list of cities with numbers next to them. Moreover, neither the notes nor any of the "information" contained in them were presented at trial.

In addition, it is difficult to see how these notes could have played any role in Saccoccia's conviction. Apart from the fact that they are virtually incomprehensible, they are described, by Saccoccia, himself, as explaining that the money in his European accounts was derived from *legitimate* sources. Thus, even if Ex. 26 had been disclosed to prosecutors, Saccoccia could not have been prejudiced because it contained exculpatory rather than inculpatory information.

### Conclusion

For all of the foregoing reasons, the Court finds that, except for the alleged violation of attorney-client privilege, none of Saccoccia's claims requires an evidentiary hearing and that his § 2255 motion should be, and hereby is, denied in its entirety.

IT IS SO ORDERED,